UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

ALYSSA A. WRIGHT              :     CIVIL ACTION
     Plaintiff

v.                       :     NO.  3: 02-CV 1398 (AWT)

PATRIC DELCIOPPO, IRENE D. TUREK,
THOMAS M. SMYTH, JR and
WOLCOTT BOARD OF EDUCATION
     Defendants           :     December 12, 2003

## LOCAL RULE 9(c)1 STATEMENT

1.     On March 27, 2002 Plaintiff, then a student at Wolcott High School,

uttered a racial epithet directed toward another student. (See deposition of Mr. William

Tully Haywood, pgs. 7-8, attached as Exhibit B; Affidavit of Mr. Patric DelCioppo,

attached as Exhibit A).

2.     At no time prior to March 27, 2002 did the plaintiff bring to the attention of

any of the Defendants any claim of harassment. ( See Affidavit of Mr. Patric DelCioppo,

attached as Exhibit A).

3.     At all times subsequent to March 27, 2002 the Defendants investigated

any complaints by Plaintiff of harassment and took action where appropriate.  (See

Affidavit of Patric DelCioppo, Exhibit A).

3.     At all times subsequent to March 27, 2002 the Defendants investigated any complaints by Plaintiff of harassment and took action where appropriate.  (See Affidavit of Patric DelCioppo, Exhibit A).

4.     Both the Plaintiff and the other student involved in the incident on March 27, 2002 were given the equivalent discipline of a one day suspension each.  (See Affidavit of Patric DelCioppo, Exhibit A).

THE DEFENDANTS
BY


_____
Joseph M. Musco
Fed ID# CT-00495
Smith, Ketaineck, Robertson & Musco
9 Washington Avenue, Suite 3-A
Hamden, CT  06518
Tel:  203-288-2323
Fax: 203-288-5855
Joe.Musco@StPaul.com

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing has been mailed or hand delivered this 16TH day of December, 2003 to:

John R. Williams
Williams and Pattis, LLC
51 Elm Street
New Haven, CT  06510


_____
Joseph M. Musco

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALYSSA A. WRIGHT<br>  Plaintiff | : | CIVIL ACTION |
| v. | : | NO. 3: 02-CV 1398 (AWT) |
| PATRIC DELCIOPPO, IRENE D. TUREK,<br>THOMAS M. SMYTH, JR and<br>WOLCOTT BOARD OF EDUCATION<br>  Defendants | : | DECEMBER 12, 2003 |

### AFFIDAVIT OF PATRIC DELCIOPPO

The undersigned, being duly sworn, hereby states the following based on my personal knowledge;

1. I am over the age of eighteen years and understand the obligations of an oath.

2. I am the Assistant Principal at Wolcott High School, and have served in that capacity at all times relevant to this lawsuit.

3. I am familiar with the allegations in this complaint.

4. As a member of the administration at Wolcott High School, I am responsible for investigating allegations of student misconduct, determining whether the student engaged in conduct that violates the student handbook and, if so, imposing appropriate discipline.

5. The Wolcott student handbook is distributed to all students and parents, and lists various offenses for which the administration reserves the right to impose discipline. The handbook contains both a description of the offense and the range of possible consequences.

6. Among the offenses in the handbook is the offense of "bullying/intimidation" which the handbook describes as "verbal or physical threats or harassment of other students". The listed consequences for this behavior include suspension. (Wolcott High School student handbook, pgs. 34-35, Exhibit A-1).



7.  On March 27, 2002, Mr. William Tully Haywood, the High School security guard reported an incident to me that involved the plaintiff Alyssa Wight and another student. Mr. Haywood said that he was monitoring the hallway when he heard a student, later identified as the plaintiff, state in a loud voice "I hate those fucking niggers". Mr. Haywood reported to me that this occurred as the hallway was crowded with students changing classes, and that the plaintiff directed her remark at an African-American student. That student then began advancing toward the plaintiff but was held back by other students, according to Mr. Haywood.

8.  I called the plaintiff and the other student into my office to hear what they had to say as part of my investigation into the incident. The plaintiff admitted using the racial slur, but said she was frustrated because the other student harassed her on prior occasions and that day had pushed another student into her in the hallway.

9.  Following my investigation, I determined that plaintiff had in fact used a racial slur against another student based on Mr. Haywood's account as well as plaintiff's admission. I also determined that the other student use a racial slur against the plaintiff based on her account and the accounts of witnesses.

10. In my judgment, the actions of both students on March 27, 2002 as referenced in the preceding paragraph constituted a violation of the school's anti-harassment policy. Based on the totality of the circumstances and after consultation with the Principal Irene Turek, I imposed a one-day suspension on each student. (Discipline Referrals, Exhibit A-2). I advised the plaintiff's parents of the suspension and their appeal rights.

11. The Wrights, plaintiff's parents, wanted me to report the alleged shoving incident to the Wolcott Police. I advised the Wrights that the school security guard did not witness whatever preceded Plaintiff's racial slur in the hallway, that Plaintiff had no apparent injury as far as I could tell, and that the other student said the physical contact in the crowded hallway was accidental. I made the judgment that I would not report this to the police based on my understanding that a criminal assault required intent and injury. This understanding is based on training provided to school administration by the Wolcott Police. I further advised the Wrights that I would report the alleged shoving to the School Resource Officer, and did so. I told the Wrights that they could make a formal complaint with the Wolcott Police, and they did this.

12. Upon information and belief, the application for an arrest warrant against the other student was presented to the court and rejected by the Judge.

13. Plaintiff's suspension was ultimately upheld by the Board of Education following the Wrights' appeal.

14. Prior to March 27, 2002 neither myself, nor any other school administrator to my knowledge, received any report or complaint that another student harassed plaintiff

15. After March 27, 2003 the administration responded with appropriate investigation and action regarding any reports or complaints involving harassment against plaintiff.

Patric DelCioppo
Assistant Principal
Wolcott High School

COUNTY OF                          }
                                   }  ss:
STATE OF CONNECTICUT               }

Personally appeared _Patric Del Cioppo_ who subscribed and swore to the foregoing as his free act and deed this _15th_ day of _December_, 2003.

Notary Public
Commissioner of Superior Court

4. **Extended Detention (XDT)**
Students assigned to Extended Detention. Detention is an extended day and concludes at 4:15 p.m. Students are given two (2) days notice when assigned to Extended Detention.

5. **Home Suspension (HS)**
This is reserved for serious offenses or for that student who will not cooperate with XDT Policy. The Administration may suspend a student for infraction of school rules. Suspension is defined as an exclusion from school privileges for not more than ten (10) consecutive school days, provided such exclusion shall not extend beyond the end of the school year in which suspension was imposed. Students will be given class assignments on request. (General Statute §10-233c).

### GENERAL RULES FOR ALL SUSPENSIONS

Attendance at or participation in any extra-curricular event of the school while under suspension is strictly prohibited. These include (but are not limited to) athletic games and practices, driver education, school dances and plays rehearsals. Disregard of this policy will result in further disciplinary action.

Any student placed on out-of-school suspension who is found on school grounds is subject to arrest for loitering on school property. Students receiving out of school suspension are prohibited from appearing on school grounds during the suspension, unless authorization to do so is granted by the Principal or Superintendent. (Wlct Bd of Ed. §114 (a)).

### Discipline Administration

Any student who skips an Extended Detention will be assigned an additional day. At that time, the student will be looked at more closely, will be home suspended (2 days HS) for insubordination if the extended detentions are not served as he required. The student, if suspended for insubordination, is still required to serve the previously assigned Extended Detentions.

### Suspension

1. **Second (2) Suspension**— student will be referred to the Student Assistance Team (SAT) or Planning and Placement Team (PPT).

2. **Third (3) suspension**— Student will be home suspended and parent conference with the assistant-principal will be required upon return to school.

3. **Fourth (4) suspension** - student will be home suspended and parent conference with the principal will be required with the principal upon return to school.

4. **Fifth (5) suspension** - student will be home suspended and parent conference with the superintendent will be required upon return to school.

### Expulsion

Upon referral by the Principal and recommendation of the Superintendent of Schools, the Board of Education may expel a student when conduct endangers persons or property or is seriously disruptive of the educational process or is violative of a publicized Board policy. (General Statute 10-233d)

**STUDENT DISCIPLINARY GUIDELINES**

**THE ADMINISTRATION OF WOLCOTT HIGH SCHOOL RESERVES THE RIGHT TO JUDGE THE SERIOUSNESS OF ANY INFRACTION AND DISCIPLINE STUDENTS ACCORDINGLY.**

34

| OFFENSE | DESCRIPTION |
|---|---|
| Abuse of Pass | Exceeding a reasonable time or failure to report to the designated location after receiving permission. |
| Arson | Setting fire to any part of school building or grounds. |
| Assault on a Staff Member | Physical contact with the intent to harm or cause bodily injury to a staff member. |
| Assault (unprovoked) | Physical contact with the intent to harm or cause bodily injury to student(s). |
| Bullying/Intimidation | Verbal or physical threats to or harassment of other students. |
| Computer Usage/Improper | Engaging in any unauthorized use of the computer, such as threats, unauthorized entry, unauthorized copying of internet, etc. |
| Cafeteria Disruption | Unacceptable behavior in the cafeteria during lunch. |
| Damage to school property / Unintended | Marring, breaking, or destroying school property unintentionally. |

35

**DISCIPLINARY REFERRAL**

Lauren Joyner

Grade ___    Period of Day 2    Date: 3/27/02    Teacher Mr. DelCioppi

Area Of Building Hallway

Describe The Problem:

Used racial slur towards another student (Alyssa Wright)

**Actions Taken By Teacher Prior To Referral:**

___ Conference w/Student
___ Detention Issued
___ Changed Student's Seat
___ Consulted Student's File
___ Consulted Counselor
___ Sent Previous Notice
___ Telephoned Parent
___ Conference w/Parent
___ Other _____
Date: _____

**Disposition Of Referral:**

X Conference w/Student (warning & reprimand)
___ Detention Assigned
___ Extended Detention Assigned
Other _____

Telephoned Parent Nancy at Beacon House
Parental Conf. Scheduled:
In-School Suspension
(Out-Of-School Suspension)

Date: 3/28/02
3/28/02

Comments:

This is part of an on-going problem that seems to have originated over an incident in the cafeteria.

Administrator Pete DelCioppi    Date 3/27/0

---

Student's Name Alyssa Wright

**DISCIPLINARY REFERRAL**

Grade ___    Period of Day 2    Date: 3/27/02    Teacher Mr. DelCioppi

Area Of Building hallways

Describe The Problem:

Used racial slur towards minority student (Lauren Joyner)

**Actions Taken By Teacher Prior To Referral:**

___ Conference w/Student
___ Detention Issued
___ Changed Student's Seat
___ Consulted Student's File
___ Consulted Counselor
___ Sent Previous Notice
___ Telephoned Parent
___ Conference w/Parent
___ Other _____
Date: _____

**Disposition Of Referral:**

X Conference w/Student (warning & reprimand)
___ Detention Assigned
___ Extended Detention Assigned    Met w̄
Other _____

Telephoned Parent Alyssa
Parental Conf. Scheduled:
In-School Suspension
(Out-Of-School Suspension)

Date: 3/28/02
3/28/02

Comments:

Alyssa "claims" she was only retaliating for "slurs" used at her. Alyssa "claims" she is being harassed by this student

Administrator Pete DelCioppi    Date 3/27/0

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

ALYSSA A. WRIGHT,

               Plaintiff,

                        : Civil Action
                        : No. 3:02 CV 1398 (AWT)

PATRIC DELCIOPPO, IRENE D. TUREK,
THOMAS M. SMYTH, JR., and
WOLCOTT BOARD OF EDUCATION,

              Defendants.

- - - - - - - - - - - - - - - x

**COPY**

        Deposition of WILLIAM TULLY HAYWOOD,

taken pursuant to the Federal Rules of Civil

Procedure, at the Wolcott High School, 457

Boundline Road, Wolcott, Connecticut, before

Michelle E. Pappas, License #00081, a Notary

Public in and for the State of Connecticut,

on Wednesday, May 14, 2003, at 2:07 p.m.



# A P P E A R A N C E S

WILLIAMS and PATTIS, LLC
Attorneys for the Plaintiff
51 Elm Street
New Haven, Connecticut  06510
        By:  DAWN WESTBROOK, ESQ.


SMITH, KETAINECK, ROBERTSON & MUSCO
Attorneys for the Defendants
9 Washington Avenue, Suite 3-A
Hamden, Connecticut  06518
        By:  JOSEPH M. MUSCO, ESQ.

1          W I L L I A M   T U L L Y   H A Y W O O D ,

2          called as a witness, having first been duly sworn

3          by Michelle E. Pappas, a Notary Public in and for

4          the State of Connecticut, was examined and

5          testified as follows:

6    DIRECT-EXAMINATION

7    BY MR. MUSCO:

8          Q.    Would you state your full name for the

9    record, please.

10         A.    William Tully Haywood.

11         Q.    And your address?

12         A.    28 Nettleton Avenue, Naugatuck, 06770.

13         Q.    And your business address?

14         A.    Wolcott High School, 457 Boundline Road,

15   Wolcott, Connecticut.

16         Q.    You're employed by Wolcott High School?

17         A.    Wolcott Board of Education.

18         Q.    And what is your job here?

19         A.    Facilities and behavior monitor.

20         Q.    How long have you held that job?

21         A.    Since January of 2002.

22         Q.    We're here about an incident that occurred at

23   Wolcott High School on/or about March 27, 2002.  Were

24   you employed in that capacity at that time?

25         A.    Yes, sir.

1      Q.    I'm going to ask you some questions about
2   what you know about the incident, but before that I'm
3   going to ask you a little bit about your background.
4      A.    Okay.
5      Q.    Can you give me your age, please.
6      A.    I'm 23 years old.
7      Q.    And when did you begin here at Wolcott High
8   School?
9      A.    I believe it was January 2, 2002, on/or
10  about.
11     Q.    And can you tell me a little bit about your
12  education?
13     A.    I have an associate's degree in criminal
14  justice from Northwestern Community College.
15     Q.    And what are you hoping to do with that?
16     A.    Police officer, law enforcement.
17     Q.    Now, Mr. Haywood, can you tell me a little
18  bit what your job responsibilities were back in March
19  of 2002?
20     A.    Sure.  What we basically do here is to be an
21  extra set of eyes and ears, keeping an eye on passing
22  time in the hallway, making sure kids aren't smoking in
23  the hallways or bathrooms.  We watch the security
24  camera, monitor detention.  That's about it.
25     Q.    Was it also within your job responsibilities

1    to report to the proper authorities here at the high

2    school if you witnessed or were told about any

3    student-on student harassment?

4          A.    Yes.

5          Q.    Now, back on March 27th of 2002, directing

6    your attention to that day, were you working that day?

7          A.    Yes, sir.

8          Q.    At some point during the school day did you

9    witness an incident between Alyssa Wright and Laurana

10   Joyner?

11         A.    Yes, sir.

12         Q.    Can you tell me where in the school that you

13   witnessed this?

14         A.    Yes, sir.  It happened in "B" corridor by the

15   male and female lavatories.

16         Q.    And can you give me some idea where the "B"

17   corridor is in relation to the school itself?

18         A.    Sure.  It's --

19         Q.    Is it on the first floor?

20         A.    It's on the first floor.  First floor, "B"

21   corridor, it's, like, one of the main hallways of the

22   school.  Runs the whole distance of the school.

23         Q.    What is off this corridor?

24         A.    There's "C" corridor, "A" corridor, "D"

25   corridor, "E" corridor, "F" corridor, just different

1    hallways are lettered.

2         Q.   All right.   Are there classrooms or locker

3    rooms or lockers off that corridor?

4         A.   There's classrooms and lockers off that

5    corridor.

6         Q.   Okay.   Tell me what you saw.

7         A.   Okay.   Well, I was standing in the downstairs

8    hallway where the bathroom is, because that's where we

9    are because the downstairs bathroom is open during the

10   lunch period, and I was standing there in between the

11   periods when Alyssa came down the hallway and I heard

12   her say what she said to the other girl, and that's

13   when I got involved.   Laurana followed her down the

14   hallway and I was trying to hold Laurana back, not

15   physically hold her back but keep from -- a fight from

16   occurring.

17        Q.   Well, let me stop you there for a minute.

18   What were you doing in the hallway at that time?

19        A.   I was monitoring the hallway for passing

20   time.

21        Q.   What is passing time?

22        A.   Passing time is between periods, in between

23   classes.

24        Q.   So this was a time when the students were --

25        A.   Hallways were full.

1      Q.    And the students were moving from one class

2    to another?

3      A.    Yes, sir.

4      Q.    Now, prior to this incident did you know

5    either Laurana Joyner or Alyssa Wright?

6      A.    No, sir.

7      Q.    Never had any dealings with either of them?

8      A.    Never, no.

9      Q.    Now, you're in the hallway and the students

10   are walking through the hallway?

11     A.    Hm-hmm.

12     Q.    You said you heard, overheard Alyssa Wright

13   saying --

14     A.    Hm-hmm.

15     Q.    -- what did you hear her say?

16     A.    She said, "I hate those fucking niggers."

17   Excuse my language.

18     Q.    Where were you in relation to her when she

19   said this?

20     A.    Approximately ten to 12 feet away.

21     Q.    It was said, obviously, loud enough so that

22   you could hear it?

23     A.    Yes.

24     Q.    How would you describe her tone of voice?

25     A.    Not a yell but loud enough for me to hear it

1    in a very crowded hallway.

2        Q.    After you heard that, did that get your

3    attention?

4        A.    Yeah, that's what drew my attention to the

5    problem.

6        Q.    And then when your attention was drawn to

7    what you just called "the problem," what did you see?

8        A.    I saw Laurana drop her stuff on the -- her

9    books and bag on the floor and start to chase after

10    Alyssa, that's when I stepped in between the two of

11    them.  By then Alyssa was long gone down the hallway.

12        Q.    Did you overhear Laurana say anything?

13        A.    I don't recall what she was saying.

14        Q.    What's the next thing that you did?

15        A.    I went to Mr. DelCioppo, the principal, and

16    reported the incident to him.  Seeing that things

17    calmed -- Laurana's friends had calmed her down to the

18    point where I felt it was safe that she wasn't going to

19    go after the other girl, that's when I reported hte

20    incident to Mr. DelCioppo.

21        Q.    Who's Mr. DelCioppo?

22        A.    He's the assistant principal.

23        Q.    Now, at that point in time you've already

24    told me that you didn't know either girl, so how were

25    you able to identify them?

1       A.    I believe Mr. DelCioppo identified them from

2    the stuff in her bags.  She had books and I think she

3    had papers inside the books that had her name on it.

4       Q.    Well, hwo did Mr. DelCioppo --

5       A.    I brought her books and her belongings to

6    Mr. DelCioppo's office.  I picked them up off the floor

7    because I didn't want her stuff on the floor during

8    pass time.  Who knows what would have happened to it.

9       Q.    Okay.  So this, if I understand correctly,

10   this girl that you later identified as Laurana Joyner

11   dropped some --

12      A.    Dropped her belongings, yes.

13      Q.    Okay.  Then you picked them up --

14      A.    Hm-hmm.

15      Q.    -- brought them to Mr. DelCioppo --

16      A.    And reported the incident to him, yes.

17      Q.    Where was Laurana Joyner at the time you

18   gathered her belongings up?

19      A.    I believe she went to her class.  I'm not

20   sure.

21      Q.    But you're saying that she left whatever it

22   was --

23      A.    Right.  She dropped her stuff and just left

24   it there.

25      Q.    Okay.  When you turned Laurana's backpack and

1    other things over to Mr. DelCioppo, what did you do

2    next?

3         A.    I went back to my post upstairs to unlock the

4    bathrooms upstairs, because after lunch we go upstairs.

5         Q.    Prior to this incident did you ever witness

6    any student-on-student harassment between those two

7    girls?

8         A.    Never.

9         Q.    Did you ever hear about any?

10        A.    No, never.

11        Q.    How about after the incident?

12        A.    Nope.

13                (Pause in the proceedings.)

14                MR. MUSCO:  That's all I have.  Thank

15        you.

16                THE WITNESS:  Okay.

17                MS. WESTBROOK:  I just have a few

18        questions.

19   CROSS-EXAMINATION

20   BY MS. WESTBROOK:

21        Q.    Can you tell me first about any prior

22   employment you had prior to working at Wolcott High?

23        A.    Okay.  I've had -- for the last four summers

24   I worked for Metropolitan District Police Department in

25   Barkhamstead, Connecticut.

Q.   Did you attend Wolcott High yourself?

A.   No, I went to Naugatuck High School.

Q.   Naugatuck.  Okay.  You said next week is your last week here; is that correct?

A.   Hm-hmm.  Yes.

Q.   Are you --

A.   I return to the Metropolitan District Police Department for the summer.

Q.   For the summer.  So do you intend to return the next school year?

A.   I'm currently testing with the Rhode Island State Police.

Q.   So you may be in Rhode Island sometime in the future?

A.   Yes.

Q.   You also said there's security cameras in the school?

A.   Hm-hmm.

Q.   Did you view any of those cameras after the incident?

A.   No.  I don't believe there was any camera in the spot where the incident took place.  Cameras are set up in the stairwells.

Q.   You said that you tried to hold Laurana back but not physically.

1      A.    Right.

2      Q.    Can you tell me exactly what you did to

3    attempt to --

4      A.    I asked her to calm down and it's not worth

5    going after her and that --

6      Q.    Did you say anything to Alyssa?

7      A.    No, she was gone.  She left.

8      Q.    Okay.  So you were concerned then about

9    Alyssa's safety?

10      A.    Right.  I was just concerned -- I figured it

11    was better they were separated.  I didn't go after her

12    once she took off down the hallway.

13      Q.    Did you see Alyssa attempt to physically harm

14    Laurana?

15      A.    No.

16      Q.    But you saw Laurana attempt to physically

17    harm Alyssa?

18              MR. MUSCO:  Object to the form.

19      Q.    You can still answer.

20      A.    Okay.  I saw her pursue her down the hallway,

21    I did not see her physically try to --

22      Q.    But your attempt to stop Laurana was so that

23    she would not physically harm --

24      A.    Yes, I was afraid of an altercation between

25    the two of them.

1    Q.    Did give statements to anybody?

2    A.    Yes.

3    Q.    Can you tell me who you gave statements to?

4    A.    Mr. DelCioppo, the assistant principal.

5    Q.    Is that the only person you gave a statement

6    to?

7    A.    I believe so.

8    Q.    Was that statement in writing or orally?

9    A.    It was in writing.

10    Q.    Do you have a copy of that statement?

11    A.    Yes.

12    Q.    Do you happen to have a copy of the statement

13    with you?

14    A.    I don't have it with me, it's upstairs.

15            (Discussion off the record.)

16            (Pause in the proceedings.)

17            (Handwritten statement marked

18        Plaintiff's Exhibit 1 for identification.)

19    Q.    I just reviewed what's been marked as

20    Plaintiff's 1.  This is a statement that you actually

21    prepared yourself or did someone else prepare it for

22    you?

23    A.    Somebody wrote it as I dictated what

24    happened.

25    Q.    Can you tell me who wrote it as you dictated

1    it?

2         A.    Mr. DelCioppo.

3         Q.    That's the assistant principal?

4         A.    Yes.

5         Q.    And first of all, can you tell me what the

6    procedure is -- withdrawn.

7               What authority or power do you have to

8    discipline the students?

9         A.    None.

10        Q.    None.  Okay.  So if there's an incident, tell

11   me what the procedure is.

12        A.    I would report it to one of the

13   administrators.

14        Q.    And is that what you did in this case?

15        A.    Yes.  Yes, ma'am.

16        Q.    And is a written statement always taken from

17   you regarding every incident?

18        A.    No.

19        Q.    Do you know why a written statement was taken

20   in this incident?

21        A.    No.

22        Q.    Have you ever actually written a statement

23   yourself on any other incident?

24        A.    Yes.

25        Q.    Okay.  How many occasions would you say

1    you've actually written a statement?

2         A.   Not involved with this job, though, on my

3    other job.

4         Q.   Have you ever actually dictated a statement

5    that was put in writing on any other incident while --

6         A.   Not here.  Not here.

7         Q.   -- while at Wolcott High School?  And were

8    you involved any further in the discipline of either of

9    the students?

10        A.   No, ma'am.

11        Q.   So the extent of your involvement is that you

12   prepared the statement after you witnessed what you

13   witnessed?

14        A.   Right.

15        Q.   Okay.  Now, did you see what happened

16   immediately preceding the comment that you heard from

17   Alyssa?

18        A.   No, ma'am.

19        Q.   And can you tell me how far away Alyssa was

20   from you when you heard the comment?

21        A.   Approximately ten, 12 feet.

22        Q.   Ten to 12 feet.  And how far away was Laurana

23   from you?

24        A.   Laurana was probably another two feet from

25   that, so 12 to 14 feet about.

1       Q.   So immediately before you heard Alyssa make

2  the comment, was Laurana walking behind Alyssa calmly?

3  Tell me what you saw.

4       A.   I don't know.  I wasn't aware of it, of -- I

5  wasn't aware of a problem until I heard the statement.

6       Q.   Can you tell me what attracted your

7  attention?  Was it the fact that Alyssa made this

8  statement or --

9       A.   Yes.

10      Q.   Were there any other students around when

11  Alyssa made the statement?

12      A.   There was a lot of students.  There was --

13  hall was full.

14      Q.   Were any statements taken from the other

15  students?

16      A.   I don't know.

17      Q.   Did you question any of the other students?

18      A.   No.

19      Q.   Do you recall who any of the students were?

20      A.   No.

21      Q.   And you say that some of Laurana's --

22  withdrawn.

23         You say that other people were telling

24  Laurana it's not worth it, don't go after her?

25      A.   Yes.

1     Q.    Do you know who those other people are?

2     A.    No.

3     Q.    If you saw those other people, would you be

4  able to identify them?

5     A.    No.

6     Q.    You also said you didn't know Alyssa nor

7  Laurana prior to this incident; is that correct?

8     A.    Correct.

9     Q.    Do you know any of their family members?

10    A.    No.

11    Q.    Do you know any of their friends?

12    A.    No.

13    Q.    Can you tell me about your relationship with

14  the students?  Are you seen as an authority figure who

15  they're afraid of or are you friends with some of them?

16    A.    I think half and half.  I like to be friends

17  with the students and be an authority figure at the

18  same time.

19    Q.    Regarding Alyssa, did you know of her or who

20  she was?

21    A.    I didn't know either before this incident.

22    Q.    Didn't know anything about her?

23    A.    No.

24    Q.    And Laurana, the same question, did you know

25  of her, who she was, anything like that?

1      A.   No.

2      Q.   The statement that you prepared, can you tell

3  me how far after the incident the statement was

4  prepared?

5      A.   I don't recall how far it was, long after.  I

6  believe it was within a week or two.

7      Q.   So it wasn't prepared the same day?

8      A.   It was not prepared the same day.

9      Q.   Okay.  So within a week or two you believe,

10  that's your best recollection of when you prepared the

11  written statement?

12      A.   Honestly, I can't say how long it was.

13      Q.   Do you know if before you prepared the

14  written statement you gave an oral statement to

15  anybody?

16      A.   Yes, Mr. DelCioppo.

17      Q.   And that's the only person you gave an oral

18  statement to?

19      A.   I believe so.

20      Q.   How did you come to put it in writing if you

21  had already given an oral statement to Mr. DelCioppo

22  and you don't usually put these in writing?  Why?

23      A.   Mr. DelCioppo asked me.

24      Q.   How did he do that?

25      A.   He came to where I was and questioned me

1    about the incident.

2         Q.    And do you have any knowledge as to why he --

3         A.    No.

4         Q.    -- wanted this in writing?

5         A.    No.

6         Q.    And is this exactly what you said or was

7    anything changed?

8         A.    Nothing's changed.

9         Q.    And did the assistant principal ask you

10   questions to give the statement or tell me --

11        A.    No, I volunteered the statement.

12        Q.    Okay.  So --

13        A.    He wrote it as I dictated it.

14        Q.    So did he come to you and say to you, tell me

15   what happened or did he say --

16        A.    He asked me what happened on that day.

17        Q.    Do you know if there's been a lot of racial

18   tension in the Wolcott High School?

19        A.    No, I don't think so.

20        Q.    Can you tell me why you referred to yourself

21   in the third person in your own statement?

22        A.    He wrote the statement.

23        Q.    Okay.

24        A.    So --

25        Q.    Okay.

1       A.    He wrote my name.

2       Q.    So then it's not necessarily word for word

3    what you said?

4       A.    It is word for word what I said.

5       Q.    Okay.  Okay.  Did you use the -- did you use

6    your own name and said Tully did not know?

7       A.    No, Mr. DelCioppo wrote it.

8       Q.    You said I.  After you prepared the statement

9    were you questioned at any other time about this

10   incident?

11      A.    Not that I recall.

12      Q.    After you prepared the statement and after

13   the incident, did you have any contact with either of

14   the students?

15      A.    I don't believe so.

16      Q.    Did any other student question you about what

17   had happened?

18      A.    No.

19      Q.    Did any other administrator or teacher or

20   anyone question you about the incident on March 27,

21   2000?

22      A.    No.

23      Q.    As you sit here today do you have any other

24   information about the incident of March 27, 2002 other

25   than what you put in this statement?

1    A.    No, that's it.

2    Q.    As you sit here today are you aware of the

3    allegations that Alyssa Wright has made against Laurana

4    Joyner?

5    A.    Not totally, no.  No, I don't -- I don't

6    know.

7    Q.    Well, when you say not totally, do you have

8    some idea?

9    A.    I know there's a lawsuit, I don't know what

10    the grounds are.

11    Q.    How do you know there's been a lawsuit?

12    A.    I'm here today.

13    Q.    Exactly.  Is that the only reason you know

14    there's been a lawsuit?

15    A.    Yes.

16    Q.    Can you tell me how you became employed at

17    Wolcott High School?

18    A.    Sure.  There was an ad in the Waterbury

19    Republican, American, and after the semester break from

20    college I applied and got it, because I was going to be

21    taking night classes.

22    Q.    Prior to being employed at Wolcott High

23    School did you know anyone at Wolcott High School?

24    A.    No.

25    Q.    Administrators, teachers?

1    A.    No.

2    Q.    Students?

3    A.    No.

4    Q.    And if you do, in fact, get the job in Rhode

5    Island, which is good for you --

6    A.    Thank you.

7    Q.    -- would you be coming back to testify if

8    necessary in this case?

9    A.    If necessary.

10    Q.    Is there anything I haven't asked you that

11    you think is important for us to know about this case,

12    these students, this incident?

13    A.    No, I think we covered everything.

14         MS. WESTBROOK:  Nothing further.

15    REDIRECT-EXAMINATION

16    BY MR. MUSCO:

17    Q.    Mr. Haywood, referring to Plaintiff's Exhibit

18    1, the statement, is that your signature that appears

19    on the bottom of the first and second page?

20    A.    Yes.

21    Q.    And before you signed each page did you read

22    what was on the page?

23    A.    Yes, sir.

24    Q.    And does it accurately reflect what you

25    witnessed?

1      A.    Yes, sir.

2      Q.    And that's what you told us here today?

3      A.    Yes, sir.

4               MR. MUSCO:  That's all I have.  Thank

5         you.

6               MS. WESTBROOK:  Nothing further.

7               (Time noted:  2:35 p.m.)

8      (Jurat follows on page 24, no omission.)

# I N D E X

## EXAMINATIONS

                                                                    Page

Direct-examination by Mr. Musco .................... 3

Cross-examination by Ms. Westbrook ................ 10

Redirect-examination by Mr. Musco ................. 22

## PLAINTIFF'S EXHIBIT FOR IDENTIFICATION

No.   Description                                        Page

1     Handwritten statement ........................ 13

(Exhibit retained by Mr. Musco.)

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of _____, 2003.

_____
Michelle E. Pappas
License #00081
Notary Public

My Commission expires:
June 30, 2004

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                                :
ALYSSA A. WRIGHT,
                                :
              Plaintiff,
                                : Civil Action
                                : No. 3:02 CV 1398 (AWT)
PATRIC DELCIOPPO, IRENE D. TUREK,
THOMAS M. SMYTH, JR., and       :
WOLCOTT BOARD OF EDUCATION,
                                :
              Defendants.
                                :
- - - - - - - - - - - - - - - x

              With the addition of the changes, if

         any, indicated on the attached errata sheet,

         the foregoing is a true and accurate

         transcript of my testimony given in the

         above-entitled action on May 15, 2003.


              _____
              WILLIAM TULLY HAYWOOD

         Subscribed and sworn to before me, the

    undersigned authority, on this the _____ day of

    _____, 2003.


              _____
                   Notary Public


    My commission expires:

Lunch Period Passing

Re: Hallway Incident - March 27, 2002
Statement from "Tully" (William T. Haywood)
Hallway Security Monitor

Tully did not know what precipitated the incident but came upon the incident as it was occurring in the hallway. Tully reports that Alyssa (white girl did not know her name at the time) said *loudly enough for anyone in the hallway at the time to hear "I hate those fucking niggers." At that time the black girl (Laurena did not know her name at the time) dropped her belongings (books, purse, etc) and began to follow Alyssa Wright down the hallway. Alyssa seemed to "be leaving in a hurry." Laurena was restrained by other students who were communicating to her i.e. "don't go after her, don't do anything you'll get yourself in trouble, it ain't worth it, etc." Tully did not hear or does not recall Laurena making any comments towards Alyssa at that time. After the incident was observed Tully went to the main office & reported the confrontation to Mr. DelGioppo.

To the best of my recollection of what I witnessed on March 27, 2002 this is an ___te accounting of what happened.

William T. Haywood

OVER

✳ Laurena definitely heard Alyssa use the racial slur, the racial slur was heard directly by Laurena & she reacted angrily by dropping her belongings & advancing towards Alyssa.